6473
23-MJ-~~XXXX~~-DHH
23-MJ-4524-DHH
23-MJ-4525-DHH

## AFFIDAVIT OF TFO JEAN-PIERRE RICARD

I, Jean-Pierre Ricard, being duly sworn, depose and state as follows:

### AGENT BACKGROUND

1.      I am a detective with the Boston Police Department, where I have worked since 1994.  I am currently assigned to the Boston Police Drug Control Unit.  Previously, from 2007 to 2018, I served as a detective assigned to the Mattapan and Dorchester sections of Boston; from 2001 to 2007, I served as a patrolman in the Jamaica Plain section of Boston; and from 1994 to 2001, I served as a patrolman in the Mattapan and Dorchester sections of Boston.  I am also assigned as a Task Force Officer ("TFO") to the Drug Enforcement Administration ("DEA"), and have been since 2019.  As a DEA TFO, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request search warrants.

2.      I have participated in many aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating witnesses, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, as well as my discussions with experienced agents and investigators, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various forms of

violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

3.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

4.     Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

## PURPOSE OF AFFIDAVIT

5.     I submit this affidavit in support of a criminal complaint against Felipe Ramon PAYANO-DELGADO and Abraham VALDEZ-MARTINEZ charging that beginning at least in or about February 2023 and continuing until October 4, 2023, PAYANO-DELGADO and VALDEZ-MARTINEZ did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, including fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (the "Target Offense").

6.     This affidavit is also being submitted in support of an application for a search warrant for the following target location:

a.     The door locks at 505 Cummins Highway, Apt. 3, Roslindale, Massachusetts (the "Target Premises"), using two sets of keys seized from the PAYANO-DELGADO and VALDEZ-MARTINEZ on the morning of October 4, 2023.  I am seeking

this first authorization pursuant to <u>United States</u> v. <u>Bain</u>, 874 F3d. 1 (1st Cir. 2017) (testing the key in the lock of a property is a search). If the above-mentioned keys open the door locks of the Target Premises, I am seeking an anticipatory search warrant to search the Target Premises. A complete description of the request to search the locks and the condition that authorizes a further search of the Target Premises is set forth in Attachments A and B, which are attached hereto and incorporated herein.

7.      As further described below, there is probable cause to believe that: (a) PAYANO-DELGADO and VALDEZ-MARTINEZ have committed a violation of the Target Offense; and (b) if the keys open the door at the Target Premises, there is probable cause to believe that evidence of the Target Offense, as set forth in Attachment C, will be located at the property to be searched, as described in Attachment B.

8.      As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that PAYANO-DELGADO and VALDEZ-MARTINEZ have committed the above-described controlled substance offense and that evidence, fruits, and instrumentalities of that offense will be found in the Target Location as described below. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

### Prior History

9.      On October 2, 2023, the Honorable M. Page Kelley, United States Magistrate Judge, District of Massachusetts, issued a warrant for 505 Cummins Highway, *Apt. 1*, in Roslindale, Massachusetts (hereinafter, referred to as "Apartment 1").  The affidavit submitted in support of that warrant is attached and incorporated by reference (the "October Affidavit").  *See* No. 23-6472-MPK.

10.      Previously on March 31, 2023, the Honorable M. Page Kelley, United States Magistrate Judge, District of Massachusetts, issued warrants authorizing the installation and monitoring of a GPS tracking device on a grey 2006 Ford Fusion, bearing Massachusetts registration 3YTK88, used by PAYANO-DELGADO during multiple fentanyl transactions, No. 23-6094-MPK, and the collection of precise location information for the telephone number (857) 746-9504, used by PAYANO-DELGADO (the "9504 Phone"), No. 23-60093-MPK.  The affidavit submitted in support of those warrants is attached and incorporated by reference herein (the "March Affidavit").

### Background of Investigation

11.      The background of the investigation is detailed in the March and October Affidavits and are not repeated in full herein.

12.      Since February 2023, the DEA has been investigating the drug trafficking activities of PAYANO-DELGADO, VALDEZ-MARTINEZ, and others. During this investigation, DEA undercover officers ("UCs") have made three controlled buys of fentanyl from PAYANO-DELGADO and VALDEZ-MARTINEZ.

**Search of Apartment 1**

13.     On October 3, 2023, UC-1 communicated with PAYANO-DELGADO to confirm a meeting on October 4, 2023, between UC-1 and PAYANO-DELGADO to purchase one kilogram of fentanyl for $22,000 and 5,000 fentanyl pills for $10,000.  This meeting was scheduled to take place at Walgreens parking lot located at 1890 Columbus Avenue, in Boston, Massachusetts.

14.      In preparation for the meeting on October 4, 2023, law enforcement set up physical surveillance outside of 505 Cummins Highway.  Law enforcement also had a poll camera in place on public property that viewed 505 Cummins Highway.

15.     A review of poll camera footage on October 4, 2023, showed that, at 9:34 A.M. PAYANO-DELGADO exited the left door of the apartment building, which leads to the first-floor unit, onto the enclosed front porch, carrying a black laptop-style bag, and then entered the right door of the apartment building, which leads to the second and third floor units.[1]

16.     Then, at approximately 9:54 A.M., PAYANO-DELGADO carrying the same black laptop-style bag, exited the door on the right side of the apartment building, which leads to the second and third floor apartments, and then entered the door on the left side of the apartment building, which accesses the first-floor apartment. Moments later, law enforcement observed PAYANO-DELGADO, VALDEZ-MARTINEZ, and an unknown male exit the building and walk toward a black 2011 Kia Sorrento with Massachusetts license plate 4WGR18.  PAYANO-

---

[1] As described in Attachment A, there are two doors within the enclosed front porch.  The door to the left accesses the first-floor apartment.  The door to the right accesses the second and third floor apartments.  The first-floor apartment cannot access the second and third floor apartments internally (i.e., entry must be made through the front porch entry way or out the back of the building).

DELGADO was carrying the same black laptop-style bag when he entered the vehicle.[2]   The vehicle remained parked for some time and then after several moments the car made a U-turn on Pleasant View Street in Roslindale, MA, and then made a left turn on Cummins Highway.   The car then took a left into a Stop and Shop shopping plaza where a traffic stop was initiated by law enforcement.

17.     PAYANO-DELGADO was driving the vehicle.   The unknown male was in the front passenger seat.   VALDEZ-MARTINEZ was in the back seat.   The three males were removed from the vehicle and placed in handcuffs.   They were read their *Miranda* rights in Spanish.

18.     A search was then conducted of the vehicle.   In the trunk of the vehicle, law enforcement located an after-market alteration to the vehicle.   When the rug covering that location was pulled back, a metal box was revealed.   Based on my training and experience, I believed this location to be a "hide," which is a storage location commonly used by drug traffickers in an attempt to conceal contraband.   Boston Police Department ("BPD") Officer Reynoso-Santos, who is a member of a BPD drug-control unit, and has specialized trainings in hides, was able to get the hide open.   Inside, law enforcement located the laptop-style bag.   BPD Officer Reynoso-Santos removed the bag from the hide and brought it to my attention.   I then photographed the bag on the backseat of the vehicle.   Inside of the pocket of the bag, I located a bundle of cash held together by elastic.   Inside of the main compartment of the bag I located what appeared to be a kilogram of suspected fentanyl with a stamp that appeared to read: "ESPANA" wrapped in clear cellophane.   I also observed a bundle of clear cellophane containing suspected fentanyl pills.

---

[2] PAYANO-DELGADO, VALDEZ-MARTINEZ, and the unknown male exited out the back of the building and law enforcement was not able to discern which door they exited from.

19.     Additionally, one set of keys was found on a carabiner clip attached to the person of PAYANO-DELGADO and another set of keys were found on a carabiner clip attached to the person of VALDEZ-MARTINEZ.  These keys were placed into evidence.  The three males along with the evidence were transported to 505 Cummings in Roslindale to be interviewed.

20.     During the execution of the search warrant of Apartment 1, law enforcement observed that the mailbox associated with the third-floor unit has a piece of white tape that appears to read: "Abraham Valdez MTN."  The mailbox is located within the enclosed front porch, which is a common area between the three apartments.

21.     On October 4, 2023, I made contact with the property manager for 505 Cummins Highway who advised that unit 1 and unit 3 are occupied by one family for both units.

22.     In September 2023, I spoke to National Grid and was advised that the utilities for Apartment 1 at 505 Cummins Highway were in the name of an individual with the last name DELGADO.  The utilities for the second-floor apartment were in the name of a person unrelated to this investigation (who was interviewed by law enforcement, outlined in the October Affidavit).  National Grid further advised that the third floor is listed as "vacant" with no account listed, but records indicate that utilities for this unit began to be used in March 2023, which is the same month PAYANO-DELGADO opened his account in connection with the first-floor apartment.

23.     Based on the facts detailed herein and in the October Affidavit, I submit there is probable cause to believe that  PAYANO-DELGADO and VALDEZ-MARTINEZ committed the Target Offense and that evidence of the Target Offense will be located within the Target Premises.

### Drug Traffickers' Use of Residences and Cell Phones Generally

24.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-

traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

    a.   Controlled substances.

    b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

    c.   Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

    d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

    e.   Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

    f.   Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments, or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

    g.   Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

    h.   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

25.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

26.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

27.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

28.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

29.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

30.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals

will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

31.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offense.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

32.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described in the March and October Affidavits, PAYANO-DELGADO used a telephone to communicate to arrange drug transactions.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the

phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  I am also aware that many drug dealers, like PAYANO-DELGADO, use encrypted communication applications on their cellular telephones, such as WhatsApp and Signal, in an effort to avoid law enforcement electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

33.   Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the

location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

34.     Search and seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

35.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through email, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a

GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

36.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

    a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to

these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

37.     The law enforcement agents will endeavor to search and seize only the cellular telephones that, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

38.     Based on the foregoing, there is probable cause to believe that evidence of the commission of the Target Offense, more specifically, the items set forth in Attachment B, will be found in the Target Premises, as described in Attachment A.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

39.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

40.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event

law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

41.     The passcode that would unlock the devices found during the search of the Target Premises is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the devices found during the search of the Target Premises to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

42.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

43.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Target Premises to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

### CONCLUSION

44.     Based on the above, I submit that there is probable cause to believe that (a) PAYANO-DELGADO and VALDEZ-MARTRINEZ have committed the Target Offense; (b) the keys seized from VALDEZ-MARTINEZ and PAYANO-DELGADO on October 4, 2023, will provide access to the Target Premises. If the keys do provide access to the Target Premises, I submit that that supports probable cause that at the Target Premises, as described in Attachment A, there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment B.  Accordingly, I respectfully request that a search warrant be issued authorizing investigators to use the keys seized from VALDEZ-MARTINEZ and PAYANO-DELGADO on October 4, 2023, to search the door locks at the Target Premises. If the keys provide access to the Target Premises, I am seeking authority to search the property described in Attachment A for the items detailed in Attachment B.

Respectfully submitted,

Jean-Pierre Ricard, TFO
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on October  4, 2023

4:35 p.m.

Hon. David H. Hennessy
United States Magistrate Judge

**ATTACHMENT A**

Locks at 505 Cummins Highway, Apt. 3, Roslindale, Massachusetts

The property located at 505 Cummins Highway, Roslindale, Massachusetts is a three-story multi-family residence.  The front of the residence has the numbers "505" in black on the outside of an enclosed porch accessed via a white storm door and an interior door.  Inside the enclosed porch, which functions as an entry foyer, are two doors into the building; the left-side door accesses Apartment 1, which is the first-floor apartment.  The right-side door accesses Apartment 2 and Apartment 3.  The property to be searched is the door that provides access to Apartment 2 and Apartment 3 (right-side door accessed from the entry foyer) as well as the door to Apartment 3 (the Target Premises).[3]



---

[3] A photograph of the door to Apartment 3 is not included since it cannot be accessed without bypassing a locked door.





**ATTACHMENT B**

505 Cummins Highway, Apt. 3, Roslindale, Massachusetts

The property to be searched is located at 505 Cummins Highway, Apartment 3, Roslindale, Massachusetts.  505 Cummins Highway is a three-story multi-family residence.  The front of the residence has the numbers "505" in black on the outside of an enclosed porch accessed via a white storm door and an interior door.  Inside the enclosed porch, which functions as an entry foyer, are two doors into the building; the left-side door accesses Apartment 1, which is the first-floor apartment.  The right-side door accesses Apartment 2 and Apartment 3.  The property to be searched is Apartment 3 (the Target Premises).







**ATTACHMENT C**
**(Items to be Seized from the Property)**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Target Offense"), from February 2023 to present:

1.  Controlled substances, including but not limited to fentanyl.

2.  Materials, equipment and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, drug pressing machines, storage bins, containers, cutting agents, and scales.

3.  Documents containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, wire transfer documents, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

4.  Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

5.  Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

6.  Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

7.  All documents and other materials evidencing the shipping or receipt of packages to or from the Target Subjects, including but not limited to invoices, waybills, packaging materials, postage meters, FedEx boxes, UPS boxes, USPS boxes, and account

statements for accounts held at FedEx, UPS, the USPS, DHL, or other shipping companies.

8. All documents evidencing or relating to foreign or domestic travel of the Target Subjects or their co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms.

9. <u>Cell Phones identified as used by or belonging to any of the Target Subjects:</u> All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking, located in the memory of any mobile telephone belonging to or identified as being used by one of the Target Subjects.

   a. For any mobile phones called for by this warrant or that might contain things otherwise called for by this warrant (the "electronic device"):

      i. evidence of who used, owned, or controlled the electronic device;
      ii. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;
      iii. evidence of counter-forensic programs and associated data that are designed to eliminate data;
      iv. evidence of when the electronic device was used;
      v. passwords, encryption keys, and other access devices that may be necessary to access the electronic device;
      vi. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

II. Off-site searching of these devices shall be limited to searching for the items described in paragraph I.

III. During the execution of the search of the Target Premises described in the corresponding Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of the Target Subject located within the Target Location to the sensor of the subject device and/or to hold the device in front of their faces in order to unlock or otherwise gain access to the subject device.

**RETURN OF SEIZED ELECTRONIC DEVICES**

If the owner of a seized electronic device requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized electronic device, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the device will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If the electronic device cannot be returned, agents will make available to device's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all electronic devices seized pursuant to this warrant for as long as is necessary for authentication purposes.